In re TECHNOLOGY FOR ENERGY, CORP., Debtor.

PUBLIC SERVICE ELECTRIC & GAS CO., & Bechtel Engineering Co., Inc., Plaintiffs,

v.

TECHNOLOGY FOR ENERGY, CORP., & American Insurance Co., Defendants.

Bankruptcy No. 3–85–00455.
Adv. No. 1–89–0266.

United States Bankruptcy Court, E.D. Tennessee.

Feb. 8, 1991.

John A. Lucas and Jeffrey S. Norwood of Hunton & Williams, Knoxville, Tenn., for Public Service Elec. & Gas Co. & Bechtel Engineering Co., Inc.

G. Rhea Bucy & A. Scott Derrick of Gullett, Sanford, Robinson & Martin, and Lawrence R. Ahern, III of Bass, Berry & Sims, Nashville, Tenn., for Technology for Energy, Corp.

Robert L. Crossley and Nicholas A. Della Volpe of Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, Tenn., and Thomas E. Ray of Patrick, Beard, Richardson & Ray, Chattanooga, Tenn., for American Ins. Co.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

### I. INTRODUCTION

Technology for Energy (TEC) is the debtor in a Chapter 11 bankruptcy case. Before its bankruptcy, TEC agreed to build a radiation monitoring system for a nuclear power plant that the plaintiffs, Bechtel and Public Service, were building in New Jersey. The parties made the contract in the form of two purchase orders; TEC was the seller; Bechtel and Public Service were the buyers. American Insurance Company issued a combination payment and performance bond for each purchase order. Bechtel and Public Service brought this suit against American Insurance and TEC primarily to collect on the bonds.

The penal sums of the bonds are $3,067,-962 and $805,709, which make the total $3,873,671.00. Bechtel and Public Service have sued American Insurance for more than twice this total.

After hearings and conferences with the attorneys, the court entered an order that it would first decide whether Bechtel and Public Service can recover more than the penal sum of either bond. This memorandum is the court's decision. In light of the procedure followed, the court's order will be in the form of a declaratory judgment.

The court will refer to both Bechtel and Public Service as Bechtel. Since the bonds are the same except for the penal sums, the court will refer to them as one bond. The court will refer to the two purchase orders as one purchase order.

## II. THE PROVISIONS OF THE BOND

The first paragraph of the bond provides: KNOW ALL MEN BY THESE PRESENTS, That we, Technology for Energy Corporation, as Seller and The American Insurance Company as Surety, are held and firmly bound unto Public Service ... as Owner–Obligee, and Bechtel Power Corporation, in its capacity as Manager for Public Service ... as Additional Obligee, in the penal sum of [$3,067,962 or $805,709] for the payment of which we jointly and severally bind ourselves, our heirs, assigns, executors, administrators and successors firmly by these presents.

The next part of the bond is the "Condition." It provides that the bond will be void if TEC meets the condition but will remain effective if TEC fails to meet the condition. The condition is that TEC will fully perform the purchase order, will pay all damages resulting from its failure to perform, and will pay any costs incurred by Bechtel and Public Service in making good a default by TEC.

The next paragraph sets out the duties of American Insurance if TEC defaults.
The Surety agrees that whenever Seller shall be, and is declared by BECHTEL to be, in default under the Purchase Order, the Surety shall promptly remedy the default, or will complete the Purchase Order in accordance with its terms and conditions and shall fully indemnify and hold harmless the OWNER and BECHTEL, from all costs, damages and expenses which may arise thereafter (including reasonable attorney's fees) and which OWNER and BECHTEL may suffer by reason of Surety's failure to so do.

The next paragraph says that changes in the purchase order will not release American Insurance from the bond.

The next two paragraphs both begin with the word "provided":
Provided, however, there shall be no liability under this bond to the Obligees, or either of them, unless the said Obligees, or either of them, shall make payments to the principal strictly in accordance with the terms of said contract as to payments, and shall perform all of the other obligations to be performed under said Purchase Order at the time and in the manner therein set forth; all of the acts of one obligee being binding on the other.
*Provided, further, that in no event shall the Principal or Surety be liable to both Obligees for more than the penalty of this bond nor shall either be liable except for a single payment for each single breach or default.* Any payment due to either Obligee may be made by check issued jointly to both Obligees. (Emphasis added.)

## III. THE MEANING OF "PENALTY"

██ The bond says that American Insurance will not be liable to both obligees for more than the penalty of the bond. American Insurance argues that this clause limits its total liability to the penal sum because "penalty" means "penal sum."

Judge Stair has previously decided that New Jersey law governs the rights of the parties under the bond. *Public Service Electric & Gas Co. v. American Insurance Co. (In re Technology for Energy, Corp.)*, 88 B.R. 182 (Bankr.E.D.Tenn.1988).

Older cases from New Jersey and other states use "penalty" to refer to the dollar

amount of a bond. *Cramp & Co. v. Doughty*, 89 N.J.L. 288, 98 A. 260 (N.J. 1916); *Gloucester City v. Eschbach*, 54 N.J.L. 150, 23 A. 360 (N.J.Sup.Ct.1892); *see also Metropolitan Cas. Ins. Co. v. United States*, 87 F.2d 144 (9th Cir.1936); *Goodspeed v. Duby*, 131 Or. 275, 283 P. 6 (1929); *Robinson Mfg. Co. v. Blaylock*, 192 N.C. 407, 135 S.E. 136 (1926); *School District No. 3 of Ford County v. United States Fidelity & Guaranty Co.*, 96 Kan. 499, 152 P. 668 (1915); *Getchell & Martin Lbr. & Mfg. Co. v. Peterson & Sampson*, 124 Iowa 599, 100 N.W. 550 (1904).

Bonds and courts now commonly use "penal sum" or "amount" to mean the dollar amount of a bond. This avoids confusion since "penalty" often comes up in bond cases when it does not refer to the dollar amount of the bond. *See, e.g., Reid v. Miles Const. Co.*, 307 F.2d 214 (8th Cir. 1962); *Massachusetts Bonding & Ins. Co. v. United States*, 97 F.2d 879 (9th Cir. 1938); *Dean v. Seco Elec. Co.*, 35 Oh.St.3d 203, 519 N.E.2d 837 (1988); *General Ins. Co. v. City of Colorado Springs*, 638 P.2d 752 (Colo.1981).

However, the use of "penalty" to mean the amount or penal sum has not disappeared. *Fisher v. Fidelity & Deposit Co.*, 125 Ill.App.3d 632, 80 Ill.Dec. 880, 466 N.E.2d 332 (1984); *Caron v. Andrew*, 133 Cal.App.2d 402, 284 P.2d 544 (1955); 72 C.J.S. *Principal & Surety* § 72 (1987).

According to Bechtel, the context shows that "penalty" does not mean "penal sum." Bechtel relies on the rest of the paragraph to support this argument. The second clause of the same sentence says that American Insurance will be liable only for "a single payment for each single breach or default." The final sentence gives American Insurance a way to pay its debt without worrying about any dispute between Bechtel and Public Service over which one should get the money. Thus, the rest of the paragraph protects American Insurance from having to pay the same damages twice as the result of having two obligees.

Bechtel says that the clause in question serves the same purpose. To reach this result, Bechtel reads "penalty" to mean all

damages caused by the failure of TEC or American Insurance to carry out the purchase order.

Bechtel's argument makes the clause in question redundant with the second clause of the same sentence. The second clause says that American Insurance will be liable only once for the same damages. This leads to the result that American Insurance will not be liable for more than the total damages even though there are two obligees. There is no need for the first clause to say the same thing less clearly. The clauses would not be joined by "nor" if they were intended to say the same thing.

This clause of the bond equates to the wording of the bond in *Monmouth Lumber Co. v. Indemnity Insurance Co.*, 21 N.J. 439, 122 A.2d 604 (1956); it said, "The aggregate liability of Surety hereunder to the Obligees or their assigns is limited to the penal sum above stated."

Bechtel's argument is not strong enough to convince the court that "penalty" should be given the peculiar meaning for which Bechtel is arguing. The court concludes that "penalty" means "penal sum". Thus, the bond appears to limit American Insurance's total liability to the penal sum, but Bechtel has a another argument for holding that the bond did not limit American's liability to the penal sum.

## IV. WHAT AMERICAN INSURANCE PROMISED TO DO IF TEC DEFAULTED AND ITS EFFECT ON THE PENAL SUM LIMIT

Bechtel argues that the bond is unlike the typical performance bond. The typical performance bond gives the surety the choice of refusing to perform the contract after the contractor defaults. In that case the surety is liable to the owner for the damages caused by the contractor's default but only up to the penal sum of the bond. *Borough of Totowa v. American Sur. Co.*, 39 N.J. 332, 188 A.2d 586 (1963); *School District No. 3 of Ford County v. United States Fidelity & Guaranty Co., supra; Fisher v. Fidelity & Deposit Co., supra; Edmund D. Cook, Inc. v. Commercial Cas. Ins. Co.*, 15 N.J.Misc. 256, 190 A. 99

(Sup.Ct.1936) *aff'd per curiam* 117 N.J.L. 440, 190 A. 102 (N.J.1937); *Veneto v. McCloskey*, 333 Mass. 95, 128 N.E.2d 337 (1955).

■ On the other hand, the penal sum does not limit the liability of a surety that takes over performance of the contract. The surety who takes over performance has a duty to complete the contract without regard to cost. Furthermore, the penal sum does not limit its liability for damages caused by its own default while performing the contract. *Federal Surety Co. v. Lalonde*, 31 F.2d 673 (9th Cir.1929); *Copeland Sand & Gravel, Inc. v. Insurance Company of North America*, 40 Or.App. 831, 596 P.2d 623 (1979) *rev'd* 288 Or. 325, 607 P.2d 718 (1980); *Caron v. Andrew, supra.*

A typical performance bond would have allowed American Insurance to choose between (1) remedying the default or completing the purchase order, and (2) paying the damages caused by TEC's default up to the penal sum.

This bond required American Insurance to (1) remedy the default or complete the purchase order, or (2) pay all damages caused by its failure to remedy the default or complete the purchase order. This does not clearly say that American Insurance had the choice of paying damages caused by TEC's default up to the penal sum.[1]

Bechtel in effect argues that there is a conflict in the bond. First the bond says that American Insurance will pay all damages caused by its failure to perform after a default by TEC. Then the bond says that American Insurance will pay no more than the penal sum.

At this point the court need not consider Bechtel's argument that the penal sum increased with the contract price. It is not crucial to the main question. The court also assumes that TEC defaulted.

■ Bechtel's argument is based on a misreading of the bond. It assumes that "all" damages means "unlimited" damages. The court sees no conflict between one part of the bond saying that American Insurance will pay all damages caused by its failure to complete the purchase order and a later part saying it will pay no more than the penal sum. "All" defines the kind of damages allowable against American Insurance, not the amount.

The bond actually says that American Insurance will "fully indemnify and hold harmless" Bechtel from all damages, expenses, etc., caused by American's failure to complete the purchase order. The court sees no difference between "fully indemnify and hold harmless" and "pay." This language does not add any weight to Bechtel's argument.

In any event, Bechtel's argument also misses an obvious point about the penal sum limit. The penal sum is always a limit on the surety's liability *for its own refusal to perform the contract. See Miracle Mile Shopping Center v. National Union Indem. Co.*, 299 F.2d 780 (7th Cir.1962); *Bill Curphy Co. v. Elliott*, 207 F.2d 103 (5th Cir.1953); *Hunt v. Bankers & Shippers Ins. Co.*, 73 A.D.2d 797, 423 N.Y.S.2d 718 (N.Y.App.Div.1979).

When viewed in this light, the wording of American's bond is the same as a typical performance bond. American Insurance promised to do one of two things if TEC defaulted: (1) remedy the default or complete the purchase order or (2) pay all damages caused by its failure to perform but not more than the penal sum.

In summary, Bechtel's argument depends on misreading the bond and misunderstanding basic surety law so that it can find a conflict in the bond where none exists.

Problems with Bechtel's method of resolving the alleged conflict also reveal the weakness of its argument. Bechtel would resolve the alleged conflict by interpreting the penal sum limit. According to Bechtel, the penal sum would have limited American's liability for damages caused *by TEC's*

---

**1.** The court assumes that "remedy the default" in this bond means correcting the default, not paying money damages, even though the payment of money damages is a common legal remedy. *Center for Auto Safety v. Ruckelshaus*, 747 F.2d 1 (D.C.Cir.1984).

*default* if American had completed the purchase order.[2]

This contradicts the wording of the penal sum limit. It says that American Insurance will "in no event" be liable for more than the penal sum. The penal sum limit also is not restricted to damages caused by TEC's default. Furthermore, if the parties had intended either of these conditions on the penal sum limit, they could easily have worded it that way.

Bechtel claims to be giving the bond a balanced interpretation that considers all parts of the bond. It gives effect to the bond's allegedly clear requirement that American Insurance complete the purchase order or be liable for unlimited damages. On the other hand, it does not make the penal sum limit entirely ineffective; it gives the penal sum limit a more limited meaning, different from its wording.

This is not a balanced interpretation of the bond. Bechtel starts by reading the bond as if the penal sum limit did not exist. Bechtel looks at American Insurance's promise to pay all damages caused by its failure to complete the purchase order and concludes that it means unlimited damages. Then, Bechtel argues that it should be allowed to rewrite the penal sum limit to support this conclusion. The correct procedure is to read American Insurance's promise to complete or pay all damages in light of the penal sum limit. That should lead to the same conclusion the court has reached; there is no conflict between the penal sum limit and American's liability for all damages caused by its failure to complete the purchase order.

Problems with Bechtel's interpretation of the penal sum limit also show that the bond was not intended to work as Bechtel argues.

The court finds it hard to believe, but suppose American Insurance did promise to complete the purchase order. Completing the purchase order might not cure or prevent some damages caused by TEC's default. According to Bechtel, American promised to pay these damages, up to the contract price, on top of the whatever it spent to complete the purchase order. The court finds this impossible to believe.

The court also sees no logic in choosing the contract price as the penal sum limit on this category of damages. This is true even if the penal sum increased with the contract price, as Bechtel argues. Of course, the contract price does make sense as the penal sum if American Insurance had the usual choice of paying damages up to the penal sum.[3]

The court concludes that the bond did not require American Insurance to complete the purchase order or be liable for unlimited damages for failure to complete. The bond gave American the usual choice of refusing to perform and being liable for damages up to the penal sum.

For the purpose of argument, however, the court will assume that there is a conflict because "all" damages was intended to mean "unlimited" damages. The court would still hold against Bechtel.

A bond normally allows the surety the choice of completing the contract or being liable for damages up to the penal sum. If this bond required American Insurance to perform or be liable for unlimited damages, then it was not a bond in the normal sense. The court might give the bond this unusual meaning if other parts of the bond supported it, but they do not. Indeed, Bechtel's argument conflicts with the basic provision of the bond; it says that TEC and American Insurance are held and firmly bound to Bechtel in the amount of the penal sum "for the *payment* of which" they bind their successors, assigns, et al. (Emphasis added.)

2. Bechtel has *not* argued that the penal sum would have limited any of American's liability if it had taken over performance of the purchase order but defaulted.

3. The court's earlier statement that the penal sum limits the surety's liability for its own failure to perform allows the reverse of Bechtel's argument, but the reverse argument is nonsensical. American Insurance would have unlimited liability for damages caused by TEC's default, but its liability for failure to complete would be limited to the penal sum.

Essentially the same arguments as those made by Bechtel were made in *Bill Curphy Co. v. Elliott, supra.* The circuit court rejected the arguments as being contrary to the nature of the bond and the surety's primary duty to pay the penal sum. This court agrees. Any real conflict between the penal sum limit and American's promise to pay all damages caused by its failure to perform should be decided in favor of the penal sum limit.

In light of the court's decision, Bechtel's argument is not helped by the rule that damages caused by the surety's breach of the bond are not limited to the penal sum. *Continental Realty Corp. v. Andrew J. Crevolin Co.,* 380 F.Supp. 246 (S.D.W.Va. 1974). The rule would help Bechtel only if American Insurance's refusal to complete the purchase order was a breach of the bond. It was not a breach since American had the usual choice of paying damages up to the penal sum.[4]

Finally, since Bechtel relied on several rules for the interpretation of contracts or surety bonds, the court should comment on its method of interpreting this bond.

Bechtel drafted the bond. According to Bechtel, it intended to make a contract very unlike a normal bond, a contract under which American Insurance was required to complete the purchase order or be liable for unlimited damages for failure to perform. The court finds this hard to believe. Anyone drafting such an unusual bond would surely make it clear, and this bond is far from clear.

Nevertheless, the court decided against Bechtel without considering who drafted the bond and without using any special rules to interpret the bond for or against Bechtel or American Insurance. *Meyer v. Standard Acc. Ins. Co.,* 114 N.J.L. 483, 177 A. 255 (N.J.1935); *Amelco Window Corp. v. Federal Ins. Co.,* 127 N.J.Super. 342, 317 A.2d 398 (App.Div.1974). Elementary rules of contract interpretation required the court to reject Bechtel's argument.

*M.G.M. Constr. Co. v. New Jersey Educational Facilities Authority,* 220 N.J.Super. 483, 532 A.2d 764 (App.Div.1987); *see also Houston Fire & Cas. Ins. Co. v. E.E. Cloer General Contractor,* 217 F.2d 906 (5th Cir.1954); *U–M Investments v. Ray,* 701 P.2d 1061 (Utah 1985).

## V. BAD FAITH AS A REASON FOR DAMAGES TO BE ALLOWED ABOVE THE PENAL SUM

Bechtel argues that bad faith refusal to pay can make American Insurance liable for damages, other than interest, that are not limited by the penal sum. Bechtel asserts two bad faith claims, one a tort claim and the other a breach of contract claim. Bechtel bases the tort claim on California law; Bechtel contends that California law allows a tort claim for bad faith refusal to pay. Bechtel bases the breach of contract claim on New Jersey law; Bechtel contends that New Jersey law allows punitive damages for bad faith breach of contract (the bond).

■ Bechtel's tort claim under California law depends on whether California was the place of the wrong under Tennessee's choice-of-law rule. The place of the wrong seems to mean the place where the defendant did the wrongful act. Likewise, the rule is sometimes stated as applying the law where the last *act* occurred that was necessary to make the defendant liable. *Restatement (Second) Conflict of Laws,* Introductory Note at 412 (1971).

Bechtel finds California to be the place of the wrong because American Insurance made the decision to refuse payment at its home office in California. Bechtel concludes that this decision was the last act required to make American Insurance liable.

The place-of-the-wrong rule has confused Bechtel on this point. The place of the wrong is the place where the last *event*

---

**4.** This rule is a more general version of the better known rule that the penal sum does not limit a surety's liability for damages (usually interest) caused by its refusal to pay. Usually the surety can breach the bond only by refusing

to perform *and* refusing to pay. *City of Camden v. Ward,* 67 N.J.L. 558, 52 A. 392 (N.J.1902); *Edmund D. Cook Co. v. Commercial Cas. Ins. Co., supra. See also New Amsterdam Cas. Co. v. Mitchell,* 325 F.2d 474 (5th Cir.1963).

occurred that was necessary to make the defendant liable. The last event is the injury to the plaintiff, not the last act done by the defendant. Thus, the place of the wrong turns out to be the place where the injury occurred. *Restatement (Second) Conflict of Laws*, Introductory Note at 412 (1971).

The Tennessee courts follow this rule. The law that applies to a tort claim is the law of state where the injury occurred. *Bailey v. Chattem, Inc.*, 684 F.2d 386 (6th Cir.1982), *appeal after remand* 779 F.2d 49 (6th Cir.1985) (per curiam), *cert. den.* 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986); *Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972).

The purpose of the bond furnished by American Insurance was to assure the building of a radiation monitoring system for a nuclear power plant in New Jersey. If American Insurance breached the bond and hindered the completion of the radiation monitoring system, then the injury to Bechtel and Public Service occurred in New Jersey, and New Jersey law should control. *Bailey v. Chattem, Inc., supra; Mackey v. Judy's Foods, Inc.*, 654 F.Supp. 1465 (M.D. Tenn.1987) *aff'd* 867 F.2d 325 (6th Cir. 1989); *Cesnik v. Chrysler Corp.*, 490 F.Supp. 859 (M.D.Tenn.1980); *see also Lange v. Penn Mutual Life Ins. Co.*, 843 F.2d 1175 (9th Cir.1988).

The court concludes that New Jersey law controls whether Bechtel has a tort claim against American Insurance for bad faith refusal to pay.

■ Of course, Bechtel has not argued for a tort claim under New Jersey law, only a claim for punitive damages for bad faith breach of contract. As a practical matter, however, the claims are the same. *See Polito v. Continental Cas. Co.*, 689 F.2d 457, 464 (3d Cir.1982) (Headnote 8). Therefore, the court will consider whether Bechtel can have either kind of claim under New Jersey law.

Since the New Jersey Supreme Court has not decided either issue, this court has to determine New Jersey law by predicting what the New Jersey Supreme Court would do. *FL Aerospace v. Aetna Cas. & Sur.*

*Co.*, 897 F.2d 214 (6th Cir.1990); *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481 (6th Cir.1989).

In *Rova Farms* the New Jersey Supreme Court created a tort claim that overlapped a contract claim for breach of the implied covenant of good faith and fair dealing. *Rova Farms Resort, Inc. v. Investors Insurance Co.*, 65 N.J. 474, 323 A.2d 495 (1974). The defendant insurance company provided liability insurance to a resort. The insurance company controlled the resort's defense in a suit by an injured guest. The company blindly refused to make a settlement offer for the full policy amount of $50,000. After the injured guest obtained a judgment against the resort for $225,000, the resort sued the insurance company for the difference. The resort argued that the insurance company acted in bad faith by not making a reasonable effort to settle the case.

The New Jersey Supreme Court allowed the suit as either a tort or breach of contract action and held the insurance company liable. The insurance company basically acted as the resort's attorney in dealing with the injured guest. The New Jersey Supreme Court relied on this "special relationship" to justify the tort claim.

After *Rova Farms* the New Jersey Supreme Court allowed an employee's claim for wrongful discharge as either a tort or breach of contract claim. The court said that an employee at will has a tort or breach of contract claim for wrongful discharge if she was fired for refusal to perform an act that would have violated a clear mandate of public policy. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980).

The case does not suggest that the New Jersey Supreme Court will allow a tort claim or punitive damages for any bad faith breach of contract without regard to whether the contract created a special relationship.

The decision in *Rova Farms* dealt with an insurance company's bad faith refusal to settle a third party's claim against the policyholder. Suppose no third party is

involved; the insurance company refuses to pay the policyholder's own claim, known as a first party claim.

Between the policyholder with a first party claim and the insurance company, no special relationship exists. There is only the insurance contract. Of course, every contract includes an implied duty of good faith and fair dealing. Does this mean that the policyholder has a tort claim or can recover punitive damages for breach of contract if the insurance company in bad faith refuses to pay his first party claim?

New Jersey's intermediate appellate court says "No." It has held that a policyholder cannot recover punitive damages from an insurance company for bad faith refusal to pay a first party claim. Bad faith by itself does not justify the recovery of tort damages; there must also be a special relationship created by the contract as in *Rova Farms*. *Pierzga v. Ohio Casualty Group*, 208 N.J.Super. 40, 504 A.2d 1200 (App.Div.1986) *cert. den.* 104 N.J. 399, 517 A.2d 402 (1986); *Ellmex Const. Co., Inc. v. Republic Ins. Co.*, 202 N.J.Super. 195, 494 A.2d 339 (App.Div.1985) *cert. den.* 103 N.J. 453, 511 A.2d 639 (1986); *Meier v. New Jersey Life Ins. Co.*, 195 N.J.Super. 478, 480 A.2d 919 (App.Div.1984) *aff'd* 101 N.J. 597, 503 A.2d 862 (1986) (no opinion on punitive damages); *Milcarek v. Nationwide Ins. Co.*, 190 N.J.Super. 358, 463 A.2d 950 (App.Div.1983); *Garden State Community Hospital v. Watson*, 191 N.J.Super. 225, 465 A.2d 1225 (App.Div.1982).[5]

The federal appeals court for the third circuit has relied on these cases, holding that New Jersey law does not allow punitive damages for bad faith breach of contract unless the contract created a special relationship between the parties. *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215 (3d Cir.1984).

The case did not involve an insurance company's refusal to pay a first party claim, but the federal district court reached the same conclusion in a case that did. The district court held that the New Jersey Supreme Court would *not* allow punitive damages for an insurance company's bad faith refusal to pay a first party claim since no special relationship existed. *Wine Imports, Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 708 F.Supp. 105 (D.N.J.1989); *see also Township of Gloucester v. Maryland Cas. Co.*, 668 F.Supp. 394 (D.N.J.1987).

■ Bechtel has criticized the district court's decision in *Wine Imports* for giving too much weight to the decisions of New Jersey's intermediate appellate court. Bechtel's criticism is wrong. The decisions of a state's intermediate appellate court are usually binding on a federal court that must apply the state's law. The federal court is bound unless it can find some strong evidence that the state's highest court will disagree with the intermediate appellate court. *Laundree v. AMCA Int'l*, 908 F.2d 43, 45–46 (6th Cir.1990). New Jersey law does not give any strong support for Bechtel's prediction that the New Jersey Supreme Court will disagree with the intermediate appellate court.

Bechtel relies on the decision by New Jersey's intermediate appellate court in *Sandler v. Lawn–A–Mat Chemical & Equipment Corp.*, 141 N.J.Super. 437, 358 A.2d 805 (App.Div.1976), *cert. den.* 71 N.J. 503, 366 A.2d 658 (1976). The appellate court said that a defendant's bad conduct in breaching a contract might be enough by itself to justify punitive damages. The court went on to say that the defendant's conduct was not bad enough to allow punitive damages.

A plaintiff can raise a new legal theory for recovery unless the existing law clearly disallows it. However, the court can avoid adopting or rejecting the theory by assuming it is the law and holding that the facts do not allow recovery. If the court's ruling on the facts is correct, the decision under the theory is not likely to be reversed on appeal. This procedure also prevents the trial court from having the case remanded by a higher court to consider a theory that it ignored before. Furthermore, this procedure allows the higher court to avoid mak-

5. By relying on *Rova Farms*, these decisions support the court's earlier point that the tort claim and the claim for punitive damages for breach of contract are practically the same.

ing a decision on whether the new theory should be recognized or rejected.

In *Sandler v. Lawn–A–Mat* New Jersey's intermediate appellate court seems to have done this. The appellate court in effect said, "Even if the law allows punitive damages for breach of contract solely because of the defendant's bad conduct, the plaintiff cannot recover because the evidence does not support its claim." Bechtel's reliance on *Sandler v. Lawn–A–Mat* is misguided. The appellate court did not endorse the theory or predict that the New Jersey Supreme Court is likely to adopt it.

Bechtel also relies on *Polito v. Continental Cas. Co., supra.* In that case the federal circuit court predicted that the New Jersey Supreme Court would allow the recovery of consequential damages caused by a fire insurance company's delay in paying the homeowner's claim. The case can be distinguished several ways.

First, consequential damages are not the same as punitive damages. Second, the New Jersey courts have separate, long-standing rules on the kinds of damages that the obligee of a performance bond can recover when the surety breaches the bond by refusing to pay. Third, after deciding *Polito*, the same circuit court said:

> Because, we are persuaded that the highest court of New Jersey would not permit an award of punitive damages for a bad faith or egregious breach of a commercial contract of the present type, we hold that the district court was not justified in relying on the *Sandler* dictum to predict New Jersey law.
>
> *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.,* 746 F.2d 215, 218 (3d Cir.1984).

The decisions by New Jersey's appellate court do not distinguish between consumer cases and business cases, but the federal circuit court made the distinction here. This was probably a way to distinguish the same court's earlier decision in *Polito* without mentioning it.

Bechtel relies also on *DiSalvatore v. Aetna Cas. & Sur. Co.,* 624 F.Supp. 541 (D.N.J.1986). The federal district court predicted that the New Jersey Supreme Court would abandon the special relation-ship requirement of *Rova Farms.* The district court allowed a homeowner's tort claim against his insurance company for bad faith failure to pay his claim under a fire insurance policy. *DiSalvatore* is at odds with the district court's later decision in *Wine Imports* and appears to be wrong.

The district court in *DiSalvatore* also relied on the unequal bargaining power of the parties as a ground the New Jersey Supreme Court would use to justify tort damages without a special relationship as in *Rova Farms.* The New Jersey Supreme Court did not rely on unequal bargaining power in *Rova Farms.* In *Pierce v. Ortho,* the New Jersey Supreme Court obviously was concerned with the power of employers over employees. The case does not suggest, however, that the New Jersey Supreme Court will adopt unequal bargaining power as a fact to be considered in all disputes between insurance companies and policyholders.

*DiSalvatore* should also be distinguished from this case on the ground that it was a consumer case. *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., supra.* The unequal bargaining power of the parties does not make sense as a fact to be considered between Bechtel, Public Service, and American Insurance. Even if the district court was correct in *DiSalvatore* for consumer cases, this court doubts that the New Jersey Supreme Court would allow tort damages for an insurance company's bad faith refusal to pay under a performance bond.

For these reasons, the court concludes that New Jersey law does not allow either a tort claim or punitive damages for breach of contract when a surety company in bad faith refuses to make payment under a performance bond.

## VI. WHETHER THE PENAL SUM INCREASED WITH THE PURCHASE ORDER PRICE

The bond says that American Insurance will not be released from the bond because of changes allowed by the purchase order. Bechtel argues that in this situation the penal sum automatically increased as

changes increased the contract price. Bechtel relies on an alleged custom or usage of the trade as support for this argument.

American Insurance argues that the parol evidence rule prevents proof of a custom or usage of the trade to support Bechtel's argument because it would contradict the express terms of the bond.

 New Jersey law allows proof of a usage of trade to explain ambiguous terms in a contract. However, New Jersey law also allows proof of a usage of trade when the contract is not ambiguous, but the usage of trade is a backdrop against which the parties understood their rights and duties under the contract.

> No doubt, where the sense of the words and expressions used in a policy is either ambiguous or obscure on the face of the instrument, or is made so by proof of extrinsic circumstances, parol evidence is admissible to explain by usage their meaning in the given case. No doubt, too, every usage of a particular trade, which is so well settled or so generally known that all persons engaged in that trade may be fairly considered as contracting with reference to it, is considered to form part of every policy, designed to protect risks in such trade, unless the express terms of the policy decisively repel the inference. But the usage, in order to be binding, must be either a general usage of the whole mercantile world, or a particular usage of universal notoriety in the trade upon which, and of the place at which, the insurance is effected; the usage of a particular place, or of a particular class of persons, cannot be binding on nonresidents, or on other persons, unless they are shown to have been cognizant of it or the usage is shown to have existed under such circumstances, or for such a length of time, as to have become generally well known to all persons concerned in or about the branch of trade to which it relates, and so as to warrant a presumption that contracts are made with reference to it.

*Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83, 85, 134 A. 771, 772–73 (N.J.1926).

In the quoted case, the plaintiff was attempting to prove a usage of trade in the business covered by the insurance policy, but the rule also seems to allow proof of a usage of trade in the insurance business itself. *Public Service Mut. Ins. Co. v. White*, 4 N.J.Super. 523, 68 A.2d 278 (App. Div.1949).

Since the parol evidence rule does not necessarily prevent proof of the alleged usage of trade, the court leaves open the question of whether there is a usage of trade and whether it applies to this bond. Since the parties may be better served by an evidentiary hearing on the question, the court will order trial briefs as the first step toward having a hearing.

## VII. MINOR PROBLEMS

The court has two minor matters to consider in order to conclude this opinion.

Some of Bechtel's argument appears to be an argument for an estoppel against American Insurance to deny coverage or to deny that the penal sum increased with the contract price. However, Bechtel did not make a separate estoppel argument, and the court makes no decision regarding estoppel.

The second question is whether the court should certify this decision for interlocutory appeal under Rule 7054. Bankr.Rule 7054 (West 1990); Fed.R.Civ.Proc. 54 (West Pamph.1990). Since the parties have not argued the point, the court withholds a decision at this time.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.