Argued and submitted November 8, 1979, reversed January 16, 1980

COPELAND SAND AND
GRAVEL, INC.,
*Appellant-Respondent,*
*v.*
INSURANCE COMPANY OF
NORTH AMERICA,
*Respondent- Petitioner,*
TOBIN, CRAWFORD &
MIKOLAVICH, INC.,
Respondent.

(No. 75-414-L, CA 11238, SC 26403)

607 P2d 718

Benjamin E. Freudenberg, Grants Pass, argued the cause for appellant-respondent. With him on the briefs was Balderree, Killoran & Nelson, Grants Pass.

Hugh B. Collins, Medford, argued the cause for petitioner. With him on the brief was Collins, Velure & Heysell, Medford.

Before Denecke, Chief Justice, and Holman, Tongue, Howell, Lent, and Peterson, Justices.

PETERSON, J.

**PETERSON, J.**

This action at law for unpaid construction materials and supplies was tried to the court, without a jury. The trial court rendered an oral opinion from the bench at the end of the trial, thereafter made a general finding for both defendants, and entered judgment thereon. On the plaintiff's appeal, the Court of Appeals affirmed as to the defendant Tobin, Crawford & Mikolavich, Inc. (TCM), reversed as to defendant Insurance Company of North America (INA), and ordered that judgment be entered in plaintiff's favor against defendant INA. INA appealed and we reverse.

### The facts

Because the plaintiff claims that there is no evidence to support the trial court's judgment for defendant INA, we must look at the evidence in the light most favorable to INA.

In September, 1973, the City of Rogue River contracted with R & W Construction Company (R & W) for the construction of a sewer system. Defendant INA was surety on R & W's performance and payment bond. In mid-1974, R & W ran out of capital to complete the job. Upon being notified of R & W's difficulties with the construction project, INA engaged defendant Tobin, Crawford & Mikolavich, Inc., a firm of local insurance adjusters, to assess the situation for INA.

TCM found that one of the key problems was that the two partners in R & W, Carlton and DeBoer, "could not communicate with the City engineer. They would immediately get into an argument as soon as someone spoke."

After TCM reported to INA, INA did the following:

1. INA obtained an assignment from R & W of the progress payments then due and to become due from Rogue River. (Rogue River did not release R & W from its contractual obligations nor agree to substitute INA as general contractor.)

2. On June 28, 1974, INA contracted with a Medford firm, Tru-Mix Construction Co., to "provide supervision and administration" for INA in the completion of the contract. The written contract contained this recital:

> "As a result of certain differences between the City of Rogue River and R & W Construction Co., Bonding Company is undertaking to complete said contract on behalf of R & W Construction Co."

The contract also gave Tru-Mix the right to hire and fire any personnel on the job, and to purchase needed materials and rent or buy needed equipment. Tru-Mix administered the job through August, 1974. There is no evidence that the plaintiff was aware of the terms of the INA/Tru-Mix agreement during the summer and fall of 1974.

3. INA employed TCM to perform various services, including the transmittal of payments to subcontractors and suppliers. TCM took its orders from an INA representative in San Francisco and from Hugh Collins, INA's Medford attorney.

TCM forthwith sent all R & W creditors a form letter asking them to sign and return "the enclosed form of assignment with your invoice for labor and materials through June 30, 1974." The letter stated that INA needed the assignments "to enable it to substantiate to the City its upcoming report of payments." The plaintiff, having previously furnished materials to R & W, received such a letter, filled out the assignment, and was paid for work done prior to July, 1974.

The plaintiff billed "INA/Tru-Mix Construction Company" for amounts due in July and August, 1974, and was paid. In August, 1974, the INA/Tru-Mix agreement was terminated by mutual consent. Thereafter, the on-site project management was provided by Mr. DeBoer, one of the R & W partners. Because of the

importance of the testimony concerning who was running the job after August 31, 1974, we quote portions of the transcript.

Mr. Mikolavich, one of the principals of TCM, testified:

"Q. Was Tru-Mix on the job throughout the time that you were working with this particular project for Insurance Company of North America?

"A. They were involved from June 1st until August 31, 1974.

"Q. And after August 31 of 1974, who was working on the job, if anyone?

"A. Mr. Wayne DeBoer actively managed the project starting September 1.

"* * * * *

"Q. Now, you have testified in response to Mr. Collins' questions that after Tru-Mix was off and R & W got actively involved again, Mr. DeBoer got actively involved in his contract?

"A. Yes, it was his job, it was R & W's job.

"Q. Are you aware of what the status of the contract arrangements were at the time, and who had a contract with whom? Was it the R & W contract with the City, or had INA taken over that contract, if you know?

"A. It is my understanding that R & W had still a contract with the City to perform."

Mikolavich testified that after September 1, 1974, the procedure went as follows:

"A. The procedure was—let's take the period from September 1, '74 on, bills would be received by R&W Construction. Mr. DeBoer would come to my Medford office, and we would sit down for two or three hours. He would go over the bills, we would add the figures to make sure that the right, that that ticket was correct, and if he felt the bill was legitimate and job related, he would initial it and say, 'Okay' on the bill. Then I assembled all the bills, usually in the first week of the month, because they were the

[329]

prior past month's bills, and make a schedule alphabetically, and transmitted that schedule to an attorney named Mr. Williams in San Francisco, who represented INA. Then sometime later I would get instructions from Mr. Williams, either by writing or telephone, to pay specific bills."

Mr. Copeland, the plaintiff's president, testified that prior to September 1, 1974, Mikolavich told him that INA was "stepping in to finish the job" and to bill the account thereafter as "INA/R & W Construction." Mikolavich denied all such conversations.

Neither INA nor Mikolavich ever ordered any materials or supplies. After September 1, 1974, the materials and supplies were ordered by "the contractor," according to Mikolavich. Payment to subcontractors, suppliers and workers was by check signed by Mikolavich and DeBoer. After September 1, 1974, federal quarterly payroll tax returns were filed in R & W's name.

The plaintiff's complaint contained two claims,[1] one for materials, labor and services provided by the plaintiff, and one for materials, labor, services and equipment rental provided by Copeland Paving, Inc., and assigned to plaintiff for collection. Two theories of recovery were alleged as to each claim. One theory was for materials and services provided at "defendants' special instance and request." The second theory of recovery was in the nature of an estoppel. Plaintiff alleged that INA and TCM made payments on the Copeland bills, that neither INA nor TCM ever told the plaintiff that they were not liable for present or future orders, that plaintiff and plaintiff's assignor would not have furnished materials or services to the job had they been notified that neither INA nor TCM was liable on the bills, and that INA and TCM should

---

[1] A third claim for $336 for money had and received is apparently not involved in this appeal, for neither party referred to it, other than to say that "no record was made at trial" regarding this claim.

be estopped from denying liability for materials and supplies delivered to the job site.[2]

*There is evidence from which the trier of fact could have found for the defendants.*

In actions at law, if the trial court's findings of fact are supported by any evidence, the appellate court is powerless to overturn the finding or to reverse a judgment entered on such finding.[3]

We believe that there is evidence to support the trial court's finding. Even though we might have found otherwise, were we sitting as the trier of fact, we are powerless to change the result. The Court of Appeals was mindful of this limitation. We quote from the majority opinion:

"Defendants argue that whether INA assumed the principal's responsibilities under the construction contract is a question of fact which was decided adversely to plaintiff by the trial court, and that there was substantial evidence to support that finding. The difficulty with defendants' argument is that certain of the facts to which plaintiff adverts are *as a matter of law* rather than fact, inconsistent with INA's status as a surety and consistent only with its assumption of the contractor's role under R & W's contract with the city. The *combination* of INA's acceptance of the assignment of rights from R & W, its acceptance of payments from the city under the principal contract, and its engaging and paying a

[2] Plaintiff makes no claim on the bond itself. The parties stipulated that the amount of the bond "has been exhausted." Both of the plaintiff's theories of recovery are based upon alleged conduct of INA and TCM.

[3] Article VII (Amended), section 3, of the Oregon Constitution provides:

"In actions at law, where the value in controversy shall exceed $200, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict. * * *"

The findings of fact of the trial court sitting as the trier of fact have the same legal effect as a jury verdict. *Troutman v. Erlandson,* 287 Or 187, 197 n 8, 598 P2d 1211 (1979); *Saga Enterprises, Inc. v. Coldwell, Banker and Co.,* 287 Or 169, 180, 598 P2d 285 (1979); *Hendrix v. McKee,* 281 Or 123, 125-126, 575 P2d 134 (1978); ORS 17.435.

subcontractor for continued performance of the original contractor's duties under that contract—all of which the evidence shows and INA does not dispute occurred—had the legal effect of making INA the contractor in place of R & W. * * *." (Emphasis in original.) 40 Or App at 835.

The Court of Appeals concluded:

"* * * We do hold that at least when, as here, there has been an assumption by the surety of the principal contractor's obligations, and there is no evidence that the other party to the principal contract has agreed for the original principal to re-assume those obligations or the current principal to be relieved of them, the latter remains responsible for the performance of its assumed obligations." 40 Or App at 836.

The Court of Appeals based its conclusion upon a rule of law that a surety, by assuming the principal's role in the actual performance of the principal's contract "* * * becomes responsible for performance of the principal contract and for all obligations incurred in connection with performance, notwithstanding the limits of liability in the bond."[4] However correct that rule may be, the record does not show, *as a matter of law,* that INA assumed the performance of R & W's contract.

We agree with the analysis of Chief Judge Schwab, dissenting:

"* * * Three of the four reasons given in support of that conclusion do not, in my opinion, establish that INA undertook to perform as the general contractor. Those stated reasons are that R & W assigned its right to receive progress payments from the city to INA, that the city thereafter made payments to INA, and that INA authorized payments to subcontractors and suppliers. As a practical matter, any surety

---

[4] 40 Or App at 834-835. The Court of Appeals cited *Ausplund v. Aetna Indemnity Co.,* 47 Or 10, 81 P 577, 82 P 12 (1905); *Suetter v. Cornwall et al.,* 102 Or 220, 201 P 1072 (1921); *Caron v. Andrew,* 133 Cal App 2d 402, 284 P2d 544 (1955). We took review of this case because of its potential significance in such a context, but we need not otherwise discuss the principle in view of our disposition of the cause.

under a performance bond who realizes that his principal is starting to have trouble, will have progress payments made to it in order that it may monitor the disbursement of funds because it is apparent at that point that some of the surety's money will have to be used also. These facts, however, do not make the surety a general contractor.

'The fourth reason, namely that INA contracted with Tru-Mix to complete the job, is the only one of the four factors which might be said as a matter of law to require a conclusion that INA intended to take over the project to the exclusion of R & W. The Tru-Mix contract indicates that that probably is what INA intended at that time. Whether or not this was intended is immaterial. There is no evidence that INA made a new contract with the city or a contract with R & W by the terms of which either plaintiff was a third-party beneficiary. Further, as pointed out above, the trial judge found against plaintiff on its contention that it changed its position to its detriment or otherwise in reliance upon promises by INA." 40 Or App at 838-839.

Beyond the analysis made by Chief Judge Schwab, the testimony relative to the dealings between the plaintiff and TCM is in marked conflict. There is evidence from which the trier of fact could have found (as did the trial judge), that although the surety was taking an active role in order to protect itself, the supplier, after September 1, 1974, was still dealing with R & W, not with INA or TCM.

Reversed.